UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

**CIVIL ACTION NO. 09-50 (WOB-JGW)**

**CYNTHIA A. RISCH**                                              **PLAINTIFF**

VS.                    **MEMORANDUM OPINION AND ORDER**

**KENTON COUNTY, ET AL.**                                      **DEFENDANTS**

This matter is before the Court on the motion of defendants for summary judgment (Doc. 318).

The Court heard oral argument on this motion on Monday, August 20, 2012.  Michael A. O'Hara represented the plaintiff, and Robin Gwinn represented defendants United States of America, HealthPoint Family Care, Inc. ("HealthPoint"), and Dr. Robert Weber.  Court reporter Lisa Wiesman recorded the proceedings.

Having heard the parties, the Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

A.  Risch's Incarceration and Illness

1.  Healthcare Services at the KCDC

Plaintiff Cynthia Risch ("Risch") was incarcerated at the Kenton County Detention Center ("KCDC") from February 26, 2008 to April 24, 2008.

At the time Risch entered the KCDC, healthcare for inmates was provided by KCDC staff, defendant HealthPoint, and Southern Health Partners ("SHP"). Dr. Robert Weber ("Dr. Weber"), an employee of HealthPoint, was present at the KCDC two mornings a week. Dr. Weber saw inmates – who were brought to him by medical staff of the KCDC -- in a secure area of the jail several floors away from the general population. (Weber Depo. 95). Dr. Weber did not do "rounds" at the KCDC.

The KCDC also provided nurses and EMTs until, on February 18, 2009, SHP began providing full-time health care providers at the jail pursuant to an agreement with the Kenton County Fiscal Court.

On April 9, 2008, HealthPoint's contract with the KCDC ended, and SHP became the sole healthcare provider at the KCDC.

### 2. Plaintiff's Illness

When Risch entered the KCDC, she had a history of thyroid problems, hypocalcemia, and Crohn's disease. On February 29, 2008, Dr. Weber reviewed Risch's medical history and ordered that she be given all the medications that she had been prescribed by Dr. Jaindl, her treating physician. (Doc. 318-8; Weber Depo. at 16, 38-39). Dr.

2

Weber also ordered that Risch's calcium levels be tested in two weeks. (*Id.*).

On March 14, 2008, Risch's calcium levels were tested and were within the normal range. (Doc. 318-10). Dr. Weber reviewed those results on March 17, 2008. (Weber Depo. 52). After that, Dr. Weber was not aware that Risch was experiencing any problems until after she was admitted to the hospital on April 5, 2008, as discussed below.

On March 28, 2008, Risch complained to the KCDC staff of headaches, blurred vision, and nausea. (Doc. 318-11). She was given Excedrin for her headaches and Phenergen for nausea.

On April 2, 2008, Risch complained of headaches, blurred vision, and vomiting. A KCDC officer contacted medical staff, and Risch went to the medical office and saw a Nurse Practitioner. Although Risch attributed her symptoms to her Crohn's disease, the Nurse Practitioner nonetheless ordered lab tests to check Risch's calcium levels.

On April 4, 2008, a Friday, the lab attempted to call the KCDC at approximately 10 p.m. with Risch's lab results, but received no answer. Lab personnel thus left a message stating that Risch's calcium levels were abnormally high.

3

The next morning, KCDC received the abnormal lab results and checked on Risch.  Risch was weak and vomiting, so staff contacted Denise Robinson, a HealthPoint Nurse Practitioner.  Staff informed Robinson of Risch's lab results and her symptoms, and Robinson ordered that Risch be taken to the hospital immediately.  Risch was therefore transported to St. Elizabeth Medical Center ("St. Elizabeth").

Dr. Weber did not become aware of Risch's problems until he reviewed, on April 7, the results of the April 4 blood test.  (Weber Depo. 56-59, 70).  At that time, he inquired of KCDC medical staff how the situation had been handled, and he learned that plaintiff had been taken to the hospital.  (*Id.*).

While at St. Elizabeth, Risch was treated with certain medications which were allegedly improperly prescribed and which contributed to severe problems she later developed.

Risch was released from the hospital on April 9, 2008, and returned to the KCDC under the care of Dr. Ronald Waldridge, who was employed by SHP.  By that time, HealthPoint's contract with the KCDC had ended, and Dr. Weber was no longer providing medical services to the KCDC.

Subsequently, Risch developed severe hypocalcemia, causing seizures, hallucinations, and other serious medical

4

conditions. After a series of medical requests and allegedly inadequate responses by KCDC staff and SHP, Risch was again taken to St. Elizabeth on April 18, 2008, where she remained for a month. She was released from custody during her stay.

Since these events, Risch has suffered from chronic and severe medical problems allegedly exacerbated by the above events.

B. **This Litigation**

Risch filed this action on April 18, 2009, naming Kenton County, numerous county officials, several KCDC employees, HealthPoint, Dr. Weber, another doctor, and ten "John Does." She asserted claims for violation of her constitutional rights and medical negligence. Following a motion for a more definite statement, plaintiff amended the complaint to specify the capacities in which she was suing certain defendants. (Doc. 46).

Because HealthPoint is a federally-funded public health center, the United States was substituted as a party but then dismissed on defendants' motion because Risch had not exhausted her administrative remedies under the Federal Tort Claims Act ("FTCA"). (Doc. 94).

Plaintiff then twice again amended her complaint, adding St. Elizabeth, many of its doctors and staff, SHP,

and the United States, asserting *Bivens* and constitutional claims against HealthPoint, Dr. Weber, and the United States.

The United States moved to dismiss the *Bivens* and constitutional claims against HealthPoint, Dr. Weber, and the United States on the grounds of sovereign immunity. The government also moved to dismiss the claims against Dr. Weber in his individual capacity on the grounds that the FTCA is the sole remedy for medical negligence claims against Public Health Service Officers. The Court granted that motion on January 8, 2010. (Doc. 153).

Thereafter, plaintiff was given leave to file a Third Amended Complaint. (Doc. 200). Defendants then filed motions to dismiss on various grounds, including statute of limitations. On April 15, 2011, the Court granted defendants' motions to dismiss plaintiff's federal claims, holding: (1) the "continuing violation" doctrine does not apply to § 1983 jail treatment cases in the Sixth Circuit; and (2) plaintiff's claims against the jail, its employees, Southern Health Partners, and St. Elizabeth's were untimely. (Doc. 286). The Court gave plaintiff leave, however, to amend her complaint yet again to pursue claims against HealthPoint.

On April 22, 2011, Risch filed her Fourth Amended Complaint naming HealthPoint, Dr. Weber, and the United States as the only defendants, alleging claims for constitutional violations, medical negligence, and civil conspiracy. (Doc. 287). Discovery and dispositive motion deadlines were set, and discovery was concluded in April 2012.

On May 29, 2012, defendants filed the pending motion for summary judgment, which is ripe.

### *Analysis*[1]

The FTCA "does not itself create a substantive cause of action against the United States; rather it provides a mechanism for bringing a state law tort action against the federal government in federal court." *Lomandon v. U.S.*, 667 F.3d 363, 372 (3d Cir. 2011) (citations omitted). Accordingly, "the extent of the United States' liability under the FTCA is generally determined by reference to state law." *Id.* *See also Lyons v. Brandly*, 430 F. App'x 377, 381 (6th Cir. 2011) ("Liability under the Act is

---

[1] Although plaintiff named Dr. Weber and HealthPoint as defendants in her Fourth Amended Complaint, the Court has already held that the Public Health Service Act makes the FTCA the sole remedy for actions such as this against employees of the Public Health Service and, as such, the United States is the only appropriate defendant. *See* Doc. 153. Further, plaintiff failed to oppose the motion for summary judgment as to her claim for "conspiracy," and she thus appears to have abandoned that cause of action.

determined by reference to the law of the state where the alleged medical malpractice or negligence occurred.") (citing 28 U.S.C. § 1346(b)), *cert. denied*, 132 S. Ct. 1721 (2012).

Moreover, under the FTCA, the United States is liable only to the extent that a private person would be liable under the same circumstances. *See* 28 U.S.C. § 1346(b)(1).

Applying these principles, this Court looks to Kentucky law to analyze plaintiff's FTCA claim for medical malpractice.

In a Kentucky medical malpractice action, a plaintiff must prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner, and that the negligence proximately caused injury or death. *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982) (citation omitted). "The bare possibility of causation will not suffice." *Id.*

In most medical negligence cases under Kentucky law, "proof of causation requires the testimony of an expert witness because the nature of the inquiry is such that jurors are not competent to draw their own conclusions from the evidence without the aid of such expert testimony." *Rogers v. Integrity Healthcare Serv., Inc.*, 358 S.W.3d 507, 511 (Ky. App. 2012) (citation omitted).

8

Thus, in order to "survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper." *Id.* at 512. *See also Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2012) (noting that "a plaintiff bringing a typical medical malpractice case is required by law to put forth expert testimony to inform the jury of the applicable medical standard of care, any breach of that standard and the resulting injury").

Plaintiff does not dispute that her negligence claim presents complex medical issues requiring specialized knowledge outside the experience of the average person, and that expert testimony is thus required to support her claim. Indeed, plaintiff has produced four expert reports: three from Dr. Arthur L. Hughes, a neurologist, and one from Dr. Stephen R. Payne, an internist.[2]

However, none of these expert reports attributes any negligence to Dr. Weber or HealthPoint, nor do they opine that any such negligence proximately caused plaintiff's alleged injuries. These reports may be summarized as follows:

---

[2] These reports were all prepared in 2009, more than a year before this Court dismissed the KCDC and St. Elizabeth defendants.

9

**Dr. Hughes: May 21, 2009**: Prepared based on his review of plaintiff's medical records. No mention of Dr. Weber or HealthPoint. Notes only that plaintiff's condition was a "complicated" medical problem, focusing on her treatment at St. Elizabeth and the fact that it "is not stated what instructions to the medical personnel at Kenton County Detention Center were given in terms of symptoms to be alert to and blood tests to be monitored" following her first discharge from the hospital. Opines that KCDC staff failed to recognize plaintiff's symptoms of hypocalcemia on April 17, 2008.

**Dr. Hughes: October 27, 2009**: Prepared following his examination of plaintiff on October 21, 2009. Repeats contents of his first report, and then notes that plaintiff "has developed some changes in personality and cognition since these events." No mention of Dr. Weber or HealthPoint.

**Dr. Hughes: November 18, 2009**: Responds to request from plaintiff's counsel for additional explanation as to conditions suffered by plaintiff due to events at issue herein. No mention of Dr. Weber or HealthPoint.

**Dr. Payne: November 10, 2009**: Prepared based on his review of plaintiff's medical records. No mention of Dr. Weber or HealthPoint. Opines that plaintiff's vomiting and hallucinations 4-5 days prior to her April 5, 2008 hospitalization were "obviously" known to "the healthcare providers at the Kenton County Detention Center." Opines that St. Elizabeth prescribed plaintiff wrong medicine (Zometa) which was "below the standard of care and [] contributed to her later severe hypocalcemia and seizure." Concludes generally that plaintiff was "inadequately monitored and treated" while at the KCDC. Also opines that "caregivers" at KCDC were negligent after her discharge from St. Elizabeth.

These expert reports thus do not provide any basis from which a reasonable jury could find that Dr. Weber or

10

HealthPoint breached any standard of care or proximately caused any injuries suffered by plaintiff.[3]

Rather, it is undisputed that Dr. Weber, upon plaintiff's admission to the KCDC, obtained from her treating physician a list of the medications she had been prescribed; that he reviewed the list and ordered that plaintiff receive those medications; and that he ordered that a blood test be done in two weeks to monitor her calcium levels. That test, performed on March 14, 2008 and reviewed by Dr. Weber on March 17, showed plaintiff's calcium level to be normal.

It is further undisputed that between March 17 and April 5 – the day that plaintiff was taken to St. Elizabeth – the KCDC staff did not bring plaintiff to see Dr. Weber or report any problems to him. (Weber Decl. ¶ 9) Indeed, Dr. Risch never personally saw Risch while she was incarcerated at the KCDC. (*Id.*). It was only after plaintiff was admitted to the hospital that Dr. Weber learned of what had transpired. By the time she was

---

[3] Plaintiff's argument that the general negligence of KCDC "caregivers" alleged in Dr. Payne's report must apply to Dr. Weber and HealthPoint because all other defendants have been dismissed is without merit. The KCDC and St. Elizabeth defendants were dismissed on statute of limitations grounds, and even were that not the case, the experts fail to identify any negligent actions specific to Dr. Weber or HealthPoint.

discharged from the hospital, HealthPoint's contract with the KCDC had ended, and Dr. Weber was no longer responsible for inmate care at the jail.

Finally, while plaintiff argues in her response that Dr. Weber was negligent because he "changed" plaintiff's medications by ordering that she take Tums, counsel's argument raises no triable issue.  As already noted, no expert has opined that Dr. Weber was negligent in any respect, although both experts reviewed the pertinent medical records which show that he ordered Tums for plaintiff.

Given the complete absence of any evidence of negligence by Dr. Weber or HealthPoint, the United States is entitled to summary judgment on plaintiff's FTCA claim, and the Court need not reach defendant's alternative arguments.


Therefore, the Court having heard the parties, and being sufficiently advised,

**IT IS ORDERED** that the motion of defendants for summary judgment (Doc. 318) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 22nd day of August, 2012.



Signed By:
William O. Bertelsman WOB
United States District Judge

TIC: 12 min.